GREAT COUNCIL OF THE IMPROVED ORDER OF RED MEN OF THE STATE OF NEW JERSEY

*v.*

MOHICAN TRIBE, NO. 64, IMPROVED ORDER OF RED MEN, alias MOHICAN TRIBE, NO. 1, AMERICAN ORDER OF RED MEN.

[Decided May 23d, 1921.]

1. One cannot become a member of a corporation without his consent, express or implied.

2. An unincorporated association cannot, by resolution or other act of the members present at a meeting, become changed into a corporation, there being neither authority therefor by statute nor even in the contract of association.

3. The members of an unincorporated association present at a regular meeting adopted a resolution to incorporate the association. The officers of the association executed and filed a certificate of incorporation under *1 Comp. Stat. p. 125.* At a subsequent regular meeting the members present adopted a resolution of ratification. No prior or subsequent notice of the intended or attempted action was given to the members, and the action was without statutory or contractual authority.—*Held* (1), that such action in nowise affected the existence or property of the association; (2) that the new corporation was a distinct entity from the *quasi*-entity of the association; (3) that no member of the association could, or did, become a member of the corporation without his knowledge and consent; (4) that a member of the association who did become a member of the corporation did not thereby lose his membership in the association nor his interest in the association's property.

4. Where, after the circumstances given above, the association's trustees, holding legal title to the association's property, resigned as trustees of the association and were elected trustees of the corporation, the title to the property still remained vested in them in trust for the members of the association.

38

5. Where, after the circumstances given above, officers of the corporation are elected believing the association to have been changed into the corporation, and the corporation has possession of the association's property, and the association is left without officers or agents, the court will direct the calling and holding of a meeting of the association, under the supervision of a master, to organize and choose officers, trustees and agents in conformity to the articles of association and by-laws, and will appoint a receiver meanwhile to take and hold possession of the association's property and deliver it to the persons so chosen by the association.

On final hearing.

*Mr. William Newcorn,* for the complainant.

*Mr. William T. Boyle,* for the defendant corporation, Mohican Tribe, No. 1, American Order of Red Men.

*Mr. Charles A. Cogan,* for the defendant's association, Mohican Tribe, No. 64, Improved Order of Red Men, et al.

BUCHANAN, V. C.

The Improved Order of Red Men is a fraternal benefit order composed of numerous local organizations, called "tribes," all of the tribes in each state being co-ordinated under the jurisdiction and authority of a state organization known as the "Great Council" of the particular state, and the several Great Councils of the states being in turn co-ordinated under a common head or organization known as the "Great Council of the United States."

Under due authority from the national body, and from the Great Council of the State of New Jersey, a local tribe or branch was organized at Haddonfield, New Jersey, in 1883, under the name of "Mohican Tribe, No. 64, Improved Order of Red Men." This body was an unincorporated association and will be hereafter referred to as "the association."

At the time of the formation of the association, the several members thereof agreed to be bound by the constitution and laws of the order then in force, or which should thereafter be duly enacted by the state council or the national council. Each new member thereafter admitted bound himself by the same agreement.

Under the general scheme and laws of the order, each tribe was, as to the "benefit" side of its affairs, locally self-contained. It paid out sick or death benefits only to its own members and did not contribute, directly or indirectly, toward the payments of benefits to any others than its own members. The funds out of which such benefits were paid arose solely from dues, assessments or contributions from its own members; no part thereof was received from members of other tribes nor from the state or national organization. Such fund was therefore a trust fund for the benefit of its members, or their representatives, primarily, irrespective of whether or not the state or national bodies would by virtue of the laws of the order have any claim to the fund upon the local association becoming "defunct." *Cf. State Council* v. *Enterprise Council, No. 16, 75 N. J. Eq. 245.*

The Haddonfield association, or tribe, functioned in all respects as a subordinate tribe of the order until 1916. In May of that year, at a meeting thereof, a resolution was passed to the effect that the tribe should become incorporated under the laws of this state as a corporation not for pecuniary profit. The resolution was passed by a majority of the twelve or thirteen members present—the total membership at the time being about one hundred and fifty. No notice of the proposed change was sent to the members, nor any subsequent notice of the action taken.

There was no purpose or intent to dissociate from the order nor to change in anywise the relationships theretofore existing between that tribe and the other tribes, or the state or national council. It appears that no one had any idea that any change in those relationships would or might result from the incorporation of the tribe. All that was had in mind was that the incorporation would be advisable because the tribe desired to purchase and hold a building (for its meeting place, &c.), and because incorporation would limit possible liability on the part of the body to the corporate assets and prevent possible individual liability of the several members.

Immediately after the passage of the resolution, five persons, who were members of the association, executed and filed a certificate of incorporation under the "Act to incorporate associations

not for pecuniary profit." By the terms of the certificate the five incorporators became such corporation, under the corporate name of "Mohican Tribe, No. 64; Imp'd O. R. M." This name, it will be noticed, is precisely the same as the name of the association, except for the fact that it is partly abbreviated—and such abbreviations are the customary abbreviations of the association's name. The purposes of the corporation are specified in the certificate as follows:

"The purposes for which this corporation is formed is to accumulate a fund by contributions of its members and the payments of dues and assessments, or by donations from others, to be used in case of sickness or disability, and to provide for the interment of deceased members, or the deceased wives of members, and granting assistance to such members as may be in need, and any and all features that tend toward benevolent and fraternal associations."

The purposes of the association were as set forth in the constitution of the national Great Council:

"To perpetuate the principles of free government; instill into the hearts of our members a higher love and a holier veneration for the flag of our common country; cultivate a spirit of fraternal and brotherly love; care for the sick members and provide for the widows and orphans of our deceased members."

At the next meeting of the association (about the same number of members being present, and largely the same persons as at the prior meeting) report of the incorporation was made, a copy of the certificate of incorporation presented and the action "ratified." The persons who were trustees of the association (and as such held the property of the association) resigned as such trustees and were re-elected or elected as trustees, the purpose and object of this being to conform to the provisions of the statute last referred to, which required, or was deemed by them to require, the election of trustees to serve for one year, whereas under the association the trustees were elected in rotation, one each six months to serve two and a half years.

Except for this, and for the fact that a copy of the certificate of incorporation, at a few subsequent meetings, hung on the wall of the meeting-room, everything thereafter proceeded exactly as

before. No notice was sent out to the members or to the state or national council that there had been any change (although there is evidence that the state council acquired informal notice of the fact of incorporation); meetings were held at the same time and place and under the same regulations and procedure as theretofore; minutes thereof were kept in the same minute-book; the books and records were kept in use; dues collected in the same way and same amounts and from the same persons; dues paid and reports made to the state council; delegates sent to the state council; the seal of the old association was used—in short, there was practically nothing whatever to indicate to any one that any change whatever had been made or attempted to be made in the organization or affairs of the tribe. Finally, in the middle of the year 1920, those who actively participated in the lodge work and meetings became dissatisfied with an increased tax levied by the Great Council (this was a small *per capita* tax on the several local lodges to provide funds for the expenses of the Great Council), refused to pay the increased tax, or any tax, and the Great Council of the state notified them by letter of July 30th, 1920, that because of the non-payment of the tax, the charter of the tribe had been suspended and the members deprived of all their rights, privileges and benefits of the order. This was wholly in accordance with the laws of the order. The letter further demanded that all the property, effects and money of the tribe be turned over to the Great Council, under the provisions of article 8 of the general laws of the Great Council of New Jersey. (That regulation provides for such turning over of property and money when a tribe shall become "defunct." Another provision is to the effect that a tribe shall not be dissolved or defunct as long as there are seven members willing to continue it.)

The local tribe (whether association or corporation) did not comply with this demand. On the contrary, Herbert W. Letts, Jr., and Herbert W. Letts, Sr., who were the then president and secretary at the meetings regularly held as aforesaid, filed, August 9th, in the Camden county clerk's office, and on August 13th, in the secretary of state's office, a certificate of change of

name of the corporation "Mohican Tribe, No. 64, Imp'd O. R. M.," to "Mohican Tribe, No. 1, American Order of Red Men."

Immediately after learning of this, complainant, the Great Council of New Jersey, filed its bill of complaint August 24th, 1920, against "Mohican Tribe, No. 64, Improved Order of Red Men, alias Mohican Tribe, No. 1, American Order of Red Men," asking that defendant be restrained from exercising any of the franchises and privileges under the charter from the complainant, from using the rites and ceremonies of the order, from disposing of any of the property, paraphernalia and moneys of the tribe; that defendant be adjudicated a duly-suspended branch of the order, and that by reason thereof all its property became vested in complainant; that an accounting be made by defendant as to such property and assets, and that it be decreed to turn over the said property and assets to complainant.

An order to show cause, with temporary restraint, was issued, and on the return thereof was continued. At the hearing on such motion it appeared that there were members of the original association who claimed to have had no part in, or knowledge of, the incorporation, or change of name, or refusal to pay dues, and who desired to continue the tribe as originally constituted. Leave was given for such to intervene as parties defendant, and to counter-claim, and such an answer and counter-claim was filed by "Mohican Tribe, No. 64, Improved Order of Red Men" (the unincorporated association), and some twenty-nine individuals claiming as members of the association as against the defendant corporation.

The real contest now is between the old association and the new corporation. The laws of the order and the constitution of the local tribe provide that the "tribe shall not be dissolved as long as seven members are willing to continue it." There are more than seven members of the association willing and desirous of continuing the old association, as a part of the order, and loyal to its laws. The complainant, therefore, does not seek to restrain them from so doing, or to obtain the property from them, but believes them entitled to continue and to have the property, and is willing and anxious that such should be the result. It claims only to be entitled to the property as asked by

its bill, in the event that the issue between the association and the corporation should be decided in favor of the latter, although it still claims the right to enjoin the corporation's use of the name "Red Men."

It is unnecessary, therefore, to go into any question of property rights as between complainant, on the one hand, and defendants on the other, because I deem it entirely clear that the association never lost title or right to the property, which consists of certain paraphernalia, a little cash and about $12,000 of securities.

The property was the property of the members of the association as such. This is true, in equity, whether the legal title be deemed to be in the several members, or in certain officers or agents, as trustees for the members. Each member has an interest in the property so long as he is a member, even though he cannot assign or convey such interest, and loses it on his ceasing to be a member.

The nature, extent and limitations of the interests of the members in the property are dependent upon the "articles of association" or agreement under which the association was formed. In the present instance that agreement is found in the "constitution and by-laws" agreed to by the original members, and by each subsequent member on his admission. By the terms of the constitution the general laws of the order are also made a part of the agreement. All of these together, therefore, constitute the contract between or among the several members themselves, and between the association as a whole and the several members. *5 C. J. 1341.*

Article 8 of the general laws of the order provide as follows:

"FUNDS.

"Section 1. All wampum or funds of a Tribe are trust funds of the Order, created for the advancement and best interests thereof as a whole, and shall never be expended for any other object or purpose than the following, to-wit:

"(a) The necessary expenses of the Tribe economically administered and as determined by the Legislative and Judicial Departments of the Order.

"(b) The payment of per capita taxes, sick and funeral benefits and for charitable purposes.

"(c) The purchase of real and personal property for Tribal use, or as investment, if permissible by law.

"(d) The loaning of same at interest; provided, That no loan shall be made to any member of the Tribe making the loan.

"(e) For social purposes, not to exceed ten per cent. of the total income of the Tribe.

"Sec. 2. The dues and other sources of revenue may be placed in separate funds for certain and specified purposes, as by the laws provided.

"Sec. 3. Upon a Tribe becoming defunct, all property, effects and wampum in its possession or belonging to it shall thereupon at once vest in and become the property of the Great Council having jurisdiction, and the same shall be delivered to the Great Incohonee or the Great Sachem upon demand, as the case may be."

I need scarcely say that an association and a corporation are very different organizations. They are not, and cannot be, the same. One man may be a member of an association and also of a corporation; the same one hundred and fifty men might constitute the entire membership of an association and the entire membership of a corporation, but still the association and the corporation would be separate and distinct things. This, of course, is admitted by defendant corporation, indeed, it must necessarily be admitted by the defendant corporation when it contends, as it does, that the association became a corporation in 1916, and by and because of so becoming and being a corporation, it from then on was no longer bound by the laws of the order. It is obvious that a corporation is bound by the laws of the state relative to corporations, which do not relate to and are in nowise controlling upon associations.

By their contract above mentioned, the members had agreed and were obligated to be and continue an association, bound by all the terms and parts of that agreement, and bound by state statutes relative to associations; and that the property accumulated by them should be held for the association and themselves as members of the association, in accordance with the tribal constitution and by-laws and general laws of the order as aforesaid.

It would seem elemental that this contract could not be changed without the consent of all the members, unless there were some provision in the contract, or in the law of this state, providing for such change upon less than the consent of all, and under certain procedure and conditions. It would also seem ele-

mental that a man cannot become a member of a corporation without his consent, at least, implied, if not expressed. It follows, as a necessary corollary, that an association cannot be incorporated—cannot be changed into a corporation instead of an association without the consent of every one of the members—at least, unless there be in the contract of association, or the statute law of the state, some provision enabling it to be done without the consent of all.

I have examined carefully the tribal constitution and by-laws and the general laws of the order, and I have been able to find no such provision enabling less than *all* of the members to change the contract in any of its fundamentals, in the way it was attempted to do and is now contended was done. There are provisions that the local by-laws may be amended on a two-thirds vote on certain procedure (which was not followed in the present case), but the by-laws may not contravene the constitution or general laws, and the latter may only be changed by the Great Council of the state. There is nothing that I can find in the law of the order in the shape of provisions for the incorporation of a tribe. There are provisions (article 14 of the general laws) as to consolidation of two or more tribes; as to this it is provided that a resolution for consolidation shall be offered, and shall lie over for two weeks, and that in the meantime notice shall be sent to each member of the proposed consolidation and of the date when the resolution will be acted upon. Surely, nothing *less* than this would suffice for the changes sought to be made in the case *sub judice*.

Now, as to any authority from the statutes of this state. Neither the act of 1898 (*1 Comp. Stat. p. 125*, amended *P. L. 1914 p. 152*), under which the incorporation of defendant corporation took place, nor any other statute of which I am aware provides for the incorporation *in toto* of a previously existing association. The provision of that statute runs to "any five or more persons, societies, associations or clubs who shall desire *to associate themselves*," &c.

Counsel for the defendant corporation, in contending that the association had a right to incorporate, cites *Pierson* v. *Gardner, 81 N. J. Eq. 505,* and *Grand Court, &c.,* v. *Court Cavour, &c.,*

*82 N. J. Eq. 89;* also *Spiritual Temple* v. *Vincent, 127 Wis. 93.* Neither of the New Jersey decisions is authority for any such proposition. In the *Pierson Case* the court says: "The *members* of the local society could have availed themselves of the statute if they had wished to be bound by corporate ties." In *Grand Court* v. *Court Cavour,* the situation dealt with in the opinion is that between a superior lodge and an actually incorporated local lodge—not the situation as to whether a local lodge which is an association can by act of less than all the members turn itself into a corporation. The decision in the Wisconsin case is reached because of a Wisconsin statute specifically providing the right and method for an association as such to incorporate without the unanimous consent of the separate members.

In the instant case, as has been pointed out, only some twelve or thirteen of the membership of about one hundred and fifty actually participated in the incorporation. Perhaps as many more may be said to have impliedly concurred therein, by reason of knowledge and acquiescence. There is no pretence that either advance or subsequent notice of the incorporation was sent to the members of the association, and the proofs show that at least a very considerable number of the association members never knew anything about the incorporation until about the time of the commencement of this suit—some, indeed, not until after the suit was commenced.

It is clear, therefore, that while the incorporation proceedings resulted in the creation and existence of a legal corporation—the corporate defendant—the association was not thereby dissolved, nor merged in the corporation, nor did it in anywise lose its existence or change the character thereof. It, likewise, is clear that no change was thus effectuated in the property of the association—either as to the legal or equitable title. Nor is there any evidence or claim that any transfer of title or interest in such property was made, or attempted to be made, by any other means than the alleged operation of law under the circumstances of the alleged incorporation and merger—there were no instruments of conveyance nor resolutions for any such. The title and interest in the property remained just as before—the members of the association had the beneficial interest, and the officers

who previously held the legal title in trust for such members, continued to hold it as such trustees. This is true, even if it be held that such officers resigned as officers of the association— for such resignation did not divest them of title or possession— and that legal title would be still held for the benefit of the members of the association, notwithstanding the "trustees" may have committed acts which would justify the beneficial owners in taking steps to deprive them of such title and possession.

Coming, now, to the occurrences in July, 1920, what effect resulted therefrom? Considering these occurrences as acts of the defendant corporation—the act of that corporation in changing its corporate name could have no effect on the property of the association. Neither could the act, or attempted act, of the corporation in withdrawing from the main organization—breaking its allegiance to, and its contract relations with, the state Grand Council. The corporation never had any allegiance to, or contractual relations with, the state or national organization— and even if it had had, the breaking of such relationship by it could not affect the property of the association. Considered from the association standpoint, there was no breaking away by the association, for, even assuming for the sake of argument that such action could be taken by the association without the consent of all its members, here, again, there was no pretence of notification to all members so as to bind them by failure to appear. If we consider that a certain number of the members withdrew, that does not constitute a withdrawal of the association, and the utmost that could result would be that the withdrawing members might cease to be members of the local association. The property would still be the property of the association for the benefit of the members remaining.

The corporation has possession of the property. This is admitted in its answer as well as shown by the proofs.

To recapitulate, briefly, then—

The property was the property of the association.

The association as such did not become a corporation; neither did it dissolve or otherwise go out of existence.

A corporation was formed by some of the members of the association.

The association did not, nor did the several members thereof, nor their agents or trustees, convey the property to the corporation.

The corporation took and holds possession of the property.

The association is not barred by laches or estopped from asserting the right to the property.

It follows, then, of course, that the association is entitled to the possession of the property. It is obvious that approximately one hundred and fifty members of the association cannot physically take and hold this property. Neither can the association, considered as a *quasi*-entity (any more than can a corporation), physically take or hold possession of property. The possession of the association, or of the members of the association, must be by agents, officers or trustees, chosen, authorized and empowered for that purpose by the members of the association. In the present case there are no such agents or trustees so chosen and authorized by the association. I take it that the meetings of the "organization," subsequent to the attempted incorporation of the association, were technically meetings of the new corporation. Most of the comparatively few members participating in such meetings believed they were a corporation and were functioning as such, and in the elections held during the succeeding four years intended to vote, and believed they were voting for officers of the corporation, and the nominees elected believed they were accepting office, and intended to accept office as officers of the corporation. The association, therefore, at present has no organization and no agents. A receiver, however, may be appointed to take possession of the property from the corporation, and hold the same until the association has chosen agents, and then to turn the possession thereof over to the agents so chosen.

There being no organization of the association, and no agents or officers to call and hold a meeting to organize and choose officers and agents, and there being no provision in the laws of the tribe or order for the calling and holding of such a meeting by any member, or set of members, the decree may provide for the calling of such a meeting and the sending of notices thereof to the members, by a special master, and for the holding of such meeting and election, under his supervision, in full accordance,

so far as possible, with the constitution and by-laws of the association.

Notice of this meeting should be sent to all members on the roll of the association or corporation. There has always been a single aggregation of individuals actually interested in the property in question and in administering, and participating in, the fraternal benefit features. There is not, and has not been, any difficulty or question as to who composed this aggregation interested in the funds and benefits—the only question has been whether that aggregation was a corporation or an association. Those who believed it to be a corporation—those who created the actually existent corporation, assumed that all the members of the association were members of the corporation—no attempt was made to exclude any one from the organization or aggregation. There is not even at the present time any split in, or attempted secession from, the local aggregation. Some members (those who do the active work) desire that the local aggregation shall be severed from allegiance to, and connection with, the state and national organization; other members (apparently, the majority of the members) are opposed to this, but there is no desire or intent on the part of either faction of the local aggregation that either itself or the other faction shall part or be excluded from the local aggregation. The members who created the new corporation have not, under the laws of the tribe or order, lost membership nor become suspended from membership, in the association by reason of creating the corporation, or taking possession of the association's property on behalf of the corporation, nor by failing or refusing to pay the *per capita* tax to the state council. (They may have rendered themselves liable to penalty or discipline from the association by reason of their acts, but we are not concerned with that in this case, for no such action has been taken, or attempted to be taken, by the association.) The local association has been suspended from the state organization by the state council, but that of course does not suspend any member of the local organization from membership in the local organization. Assuming (as is doubtless the fact), that during the four years, from 1916 to 1920, new members have been elected into the local aggregation, and assuming that

they understood and believed that the aggregation was a corporation, and that they technically, therefore, joined the corporation and not the association—nevertheless, what in fact such new members intended to do, and believed they were doing, was the attainment of membership in the actual aggregation, whether association or corporation. Equitably, therefore, these new members should be deemed members of the association. They have paid their dues and acted in all respects precisely as they would if there had been no corporation. The members of the association receiving the benefits of the dues paid in by such new members have no cause to complain; and, certainly, the corporation having represented to these new members that they were joining the local aggregation having the property cannot be heard to object.

I see no cause for separating, or attempting to separate, out from the property to be turned over by the corporation to the association any moneys representing dues paid to the corporation by those who created the corporation and knew it to be a corporation. As is the case with the new members, they did not intend to pay to a corporation or other organization distinct and separate from the actual local aggregation; they have received benefits from the actual aggregation, either in the shape of actual benefit payments or "protection," as it is called, in the language of insurance. Their membership in the association being preserved they lose nothing; and, furthermore, if there were no other reason, their dues have become indistinguishably mingled with the funds of the association in such a way that it would be utterly impractical to separate out any balance as now properly theirs, and this mingling has been done by their own unlawful acts.

If they hereafter fail to persuade the association to sever itself from the state organization, and thereafter see fit to withdraw themselves from the local association, that will be their own affair; we are concerned with no such situation at the present time. They are, as I have said, still members of the association and have lost nothing and will lose nothing by the transfer of the funds to the association. They can only sustain loss by some possible future act.

There remains the question of the use by the corporation of the name Red Men and of the rituals. It is unlikely that this question will be of any real importance, in view of the result reached as to the matters hereinbefore considered. Inasmuch as there is the bare possibility, however, that a dissatisfied few *may* seek to continue the existence and the acts of the corporation, it is probably advisable to determine that issue.

The use of the name is admitted. The use of the rituals is denied, but the proofs show that such use, with only minor modifications, has in fact been actually made after the change of corporate name and suspension by the state council. Subsequent cessation after bill filed will not deprive the complaining parties of the right to restraint. *Cf. Kroecker* v. *Camden Coke Co., 82 N. J. Eq. 373* (at *p. 394*).

As to the use of the rituals, therefore, the right of complainants and of the local association to a decree restraining the corporation seems clear. The corporation's only possible claim to the right to use the ritual must be rested upon a claim to be a part of the general organization. It makes no such claim, but, on the contrary, contends that since July, 1920, it has been no part or parcel with the general organization, and does not desire to use, and is not now using, the ritual.

As to the use of the name, it seems likewise clear from the authorities (see *Cape May Yacht Club* v. *Cape May Yacht and Country Club, 81 N. J. Eq. 454,* and cases therein cited) that both the state council and the local association would have the right to have the corporation restrained from using the name "Red Men," unless that right has been lost by acquiescence or laches. The claim of the defendant corporation is that the complainant had knowledge through the knowledge of one of its officers, at the time of the incorporation, that the incorporation had been effected; that the state council had acquiesced, without protest, during the ensuing four years, in the use of the name by the defendant corporation, and had therefore lost its right to restrain. I confess that in view of the fact that the use of the name by the defendant corporation during all that time was in nowise hostile to, nor in competition with, the state

council, but, on the contrary, in complete subjection to, or co-operation with, the state council, under the belief and representation by the defendant corporation that it was still the same subordinate lodge of the order, I should have great difficulty in finding any acquiescence by complainant; and, inasmuch as complainant immediately filed its bill upon the commencement of the hostile. or competitive use by defendant corporation, it has not been guilty of laches.

But whatever might be the situation of complainant in this regard, assuredly, the counter-claimants, the members of the local association, have the right to have the defendant corporation restrained. No acquiescence as to the local association, or, at least, as to the majority of its members, is or can be claimed, for they had no knowledge or notice that the defendant corporation had been formed and was functioning (whether or not hostile to, or in competition with, the state council and the local association), but, on the contrary, the acts or omissions by defendant corporation were such as to preclude such knowledge by, or notice to, the members of the association.

The corporation should therefore be restrained from using the name "Red Men" and from using the ritual.

The form of decree may be settled upon notice.

I have not overlooked the possibility that in order for the decree in this case to afford complete relief, it may be necessary to bring in as parties the "trustees" or persons having the actual legal title to the property beneficially owned by the members of the association, in order that the decree may provide for a conveyance of the legal title to the property by them to the new trustees to be chosen by the association. The counter-claim of the association members can readily be amended by adding the names of such persons, and the facts as to their holding the legal title, with a prayer for process against them. Doubtless, they would appear and answer at a short day, submitting to be bound by the evidence at the hearing already had, since they would have no claim or interest in the property other than as trustees for the association or for the corporation, and the issues in that behalf have been fully considered; indeed, a failure in such indi-

cated procedure by them might result in their being visited individually, with costs. On the other hand, it may not be necessary for this course to be taken, inasmuch as the said "trustees" will probably be entirely willing to execute voluntarily the requisite instruments of conveyance to the new trustees to be chosen; and, in the present situation of the case, a decree may be made with no other parties than those already in court, adjudicating the equitable title to the property, inasmuch as the two claimants to such equitable title are before the court.